Old Battleground Props., Inc. v. Cent. Carolina Surgical Eye Assocs., P.A., 2015 NCBC 18.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| WAKE COUNTY | 15 CVS 1648 |

OLD BATTLEGROUND PROPERTIES, INC. and NIVISON FAMILY INVESTMENTS, LLC,

          Plaintiffs,

v.

CENTRAL CAROLINA SURGICAL EYE ASSOCIATES, P.A.; HUTA LEASING, LLC; SOUTHEASTERN EYE MANAGEMENT, INC.; SOUTHEASTERN CATARACT LASER CENTER, PLLC; EMS PARTNERS, LLC; C. RICHARD EPES, a/k/a RICHARD EPES, a/k/a CHARLES RICHARD EPES, a/k/a E. RICHARD EPES; BESSIE K. EPES, a/k/a BESSIE EPES, a/k/a BETSY EPES; JAMES MARK MCDANIEL, JR., a/k/a JAMES M. MCDANIEL, JR., a/k/a MARK MCDANIEL, and PATRICIA MOORE MCDANIEL,

          Defendants.

**ORDER AND OPINION ON PLAINTIFF'S RENEWED MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND FOR INSPECTION AND INVENTORY OF COLLATERAL AND APPOINTMENT OF RECEIVER**

*Smith Debnam Narron Drake Saintsing & Myers, LLP, by Byron L. Saintsing, Esq. for Plaintiffs Old Battleground Properties, Inc. and Nivison Family Investments, LLC.*

*McAllister, Aldridge & Kreinbrink, PLLC, by Kenneth W. McAllister, Esq. and the Law Offices of Richard M. Greene, by Richard M. Greene, Esq. for Defendants Central Carolina Surgical Eye Associates, P.A., HUTA Leasing, LLC, Southeastern Eye Management, Inc., Southeastern Cataract Laser Center, PLLC, EMS Partners, LLC, Charles Richard Epes, M.D., and Bessie K. Epes.*

*Defendant J. Mark McDaniel, pro se.*

*Ward & Smith, P.A., by Michael J. Fields, Esq. for Carolina Eye Associates, P.A.*

*Bell, Davis & Pitt by D. Anderson Carmen, Esq. for JP Morgan Chase Bank NA.*

Bledsoe, Judge.

{1} **THIS MATTER** is before the Court upon Plaintiff Nivison Family Investments, LLC's ("NFI") Renewed Motion for Temporary Restraining Order and Preliminary Injunction[1] and for Inspection and Inventory of Collateral (the "Motion") pursuant to Rules 34 and 65 of the North Carolina Rules of Civil Procedure, and upon the parties' joint request at the February 23, 2015 hearing that the Court appoint a receiver for Defendants Central Carolina Surgical Eye Associates, P.A. ("CCSEA"), Southeastern Cataract Laser Center, PLLC ("SCLC"), HUTA Leasing, LLC ("HUTA" or "HUTA Leasing"), Southeastern Eye Management, Inc. ("SEM"), and EMS Partners, LLC ("EMS Partners").

{2} The Court, having considered the Motion, affidavits, and supporting briefs, as well as the arguments advanced at the February 23, 2015 hearing in this matter,[2] **FINDS** and **CONCLUDES**, for the limited purpose of determining the Motion, as follows:

I.

FINDINGS OF FACT

{3} On March 30, 2012, Old Battleground sold commercial premises located at 3312 Battleground Avenue in Greensboro, North Carolina to MMRE, LLC ("MMRE"), a North Carolina limited liability company in which Dr. Epes and Mr. McDaniel were members and managers prior to its administrative dissolution in March 2014, for the sum of $6,615,000. In connection with that sale, MMRE

---

[1] Plaintiff NFI has sought only to bring forward at this time Plaintiff's Motion for Temporary Restraining Order and Plaintiff's Motion for Inspection and Inventory of Collateral. Accordingly, the Court will only address those Motions and will not address Plaintiff's Motion for Preliminary Injunction at this time.

[2] The Court heard arguments from counsel for Plaintiffs NFI and Old Battleground Properties, Inc. ("Old Battleground"), counsel for Defendants CCSEA, SCLC, HUTA, SEM, EMS Partners, Charles Richard Epes, M.D. ("Dr. Epes), and Bessie K. Epes ("Ms. Epes"), counsel for Carolina Eye Associates, Inc. ("CEA"), counsel for JP Morgan Chase Bank, NA ("JP Morgan"), and Defendant James Mark McDaniel ("Mr. McDaniel"), appearing *pro se*. Defendant Patricia Moore McDaniel did not appear at the hearing or present arguments on her behalf regarding Plaintiff's Motion.

granted Old Battleground a Purchase Money Note and Deed of Trust in the amount of $6,615,000.

{4}  On August 3, 2012, MMRE sold the leased commercial premises to Broadstone Net Lease Acquisitions, LLC ("Broadstone"), a New York limited liability company.

{5}  Concurrently with the sale of the commercial premises from MMRE to Broadstone, NewBridge Bank, a lender to CCSEA, agreed to accept a discounted sum of $2,100,000 in satisfaction of the debt owed by MMRE, CCSEA, Dr. Epes, and others for equipment utilized in CCSEA's practice and for other loans held by NewBridge Bank from entities affiliated with Defendants.  NFI agreed to loan the sum of $2,100,000 that Old Battleground would otherwise have received from the sale proceeds in order to facilitate the transaction with NewBridge Bank.  The debt owed to NewBridge Bank at the time of the payoff on the loans was approximately $3,400,000.

{6}  In order to facilitate the above transaction, on or about September 21, 2012, NFI loaned the sum of $2,100,000 to JDPW Trust U/T/A Dated June 8, 2007 ("JDPW Trust") in exchange for a promissory note from JDPW Trust, as well as personal guaranties from Dr. Epes, Ms. Epes, CCSEA, and Mr. McDaniel (the "Guaranty Agreement"),[3] and a Pledge Agreement to Plaintiff NFI from Dr. Epes and allegedly from Ms. Epes (the "Pledge Agreement").[4]

{7}  Plaintiffs have alleged that JDPW Trust is in default under the terms of the JDPW Trust Promissory Note, and that CCSEA, Dr. Epes, Ms. Epes, and Mr. McDaniel are in default under the terms of the Guaranty Agreement.

{8}  A portion of the collateral subject to the Pledge Agreement is described in Exhibit A thereto as, "[a]ll personal property, artwork, antiques and furniture owned by Pledgors" (the "Artwork Collateral").  NFI attempted to perfect its

---

[3] A copy of the Guaranty Agreement is attached to Plaintiffs' Complaint as Exhibit E.

[4] A copy of the Pledge Agreement is attached to Plaintiffs' Complaint as Exhibit F.

security interest in this collateral by filing UCC-1 financing statements ("Financing Statements").[5]

{9} On or about July 25, 2014, Dr. Epes and Ms. Epes had NFI named as an additional insured and loss payee as to the Artwork Collateral on their casualty insurance policy.[6]

{10} As a result of the default on the JDPW Trust Promissory Note, NFI has alleged that it is entitled to immediate enforcement of its security interest in the Artwork Collateral identified in Exhibit A to the Pledge Agreement and identified in Exhibits A and B to the Financing Statements, and that it has the right to immediate possession of the Artwork Collateral.

{11} NFI has further alleged that it is entitled to obtain a judgment for possession of the Artwork Collateral identified in Exhibit A to the Pledge Agreement and identified in Exhibits A and B to the Financing Statements and for an accounting of the sale of any of the Artwork Collateral subject to NFI's lien.

{12} Defendants contend that the Artwork Collateral is owned exclusively by Ms. Epes and that it consists of two groups: the first group comprised of approximately fifteen (15) works of art, of which, fourteen (14) pieces are works by Andrew Wyeth and one (1) is a work by Jamie Wyeth (collectively, the "Wyeth Artwork"), and the second group comprised of several original etchings of Rembrandt, Salvador Dali, and Pablo Picasso, as well as numerous chess sets and other collateral (collectively, the "Rembrandt Artwork"). The parties agree that JP Morgan has a first-priority perfected lien on the Wyeth Artwork, but JP Morgan has represented that it does not claim a lien or encumbrance on the Rembrandt Artwork.[7]

---

[5] A copy of the Financing Statements is attached to Plaintiffs' Complaint collectively as Exhibit G.

[6] A copy of the casualty insurance policy is attached to Plaintiffs' Complaint as Exhibit H.

[7] A copy of JP Morgan's August 31, 2010 UCC-1 financing statement covering the Wyeth Artwork is attached as Exhibit C to Defendant's Brief in Opposition to Plaintiff's Motion.

{13} On May 8, 2013, JP Morgan filed a UCC-1 Financing Statement naming Ms. Epes as the debtor because Dr. Epes had previously transferred substantially all of his personal property (other than his interest in CCSEA) to Ms. Epes by notice dated November 23, 2006.[8]

{14} Defendants argue that NFI does not have a perfected security interest in the Wyeth Artwork because the UCC-1 Financing Statement NFI filed to secure the collateral specifically excludes the Wyeth Artwork. The eighth page of Exhibit A to NFI's UCC-1 begins with "SAVE AND EXCEPT" followed by a copy of JP Morgan's August 31, 2010 UCC-1 financing statement which lists the Wyeth Artwork.[9] Defendants contend that NFI's intent to except the Wyeth Artwork from its security interest is further evidenced by a letter prepared by A. E. Nivison ("Nivison"), NFI's general manager, affirming that NFI does not claim a security interest, lien, or other encumbrance in the Wyeth Artwork.[10]

{15} Defendants also claim that NFI does not have a security interest in the Rembrandt Artwork, which appears to be owned exclusively by Ms. Epes due to the assignment of Dr. Epes's interest in substantially all of his personal assets to Ms. Epes. Defendants contend that the Guaranty Agreement and Pledge Agreement by which Ms. Epes allegedly became personally liable on the $2.1 million promissory note executed between JDPW Trust and NFI were both forgeries. The following writing appears in the signature block for Ms. Epes's signature on the Pledge and Guaranty Agreements, "Bessie K. Epes, POA C. Richard Epes." Dr. Epes and Ms. Epes each assert by sworn affidavit, however, that Dr. Epes never signed either document as attorney-in-fact for Ms. Epes and that Ms. Epes has never granted Dr. Epes a general power of attorney to serve as her attorney-in-fact.

---

[8] A copy of JP Morgan's UCC-1 financing statement is attached as Exhibit D to Defendant's Brief in Opposition to Plaintiff's Motion, and a copy of the assignment of Dr. Epes's personal property rights is attached as Exhibit E to Defendant's Brief in Opposition to Plaintiff's Motion.

[9] A copy of NFI's UCC-1 financing statement is attached to Plaintiffs' Complaint as Exhibit G.

[10] A copy of this letter is attached as Exhibit G to Defendants' Brief in Opposition to Plaintiff's Motion.

{16}  On April 10, 2014, NFI filed a UCC-1 Financing Statement Amendment ("Amended Financing Statement").[11]  The Amended Financing Statement attempts to add the Wyeth Artwork as collateral, in which JP Morgan maintains a first priority perfected and secured lien.  Defendants contend NFI was not granted a subsequent security interest in the Wyeth Artwork, and was therefore, not authorized to file the Amended Financing Statement.  NFI has not offered a security agreement to indicate the Amended Financing Statement was properly authorized.

{17}  Contemporaneously with the execution of the JDPW Trust Promissory Note, the Guaranty Agreement, and the Pledge Agreement, NFI and JDPW Trust entered into an Agreement (the "NewBridge Bank Assignment") on or about September 21, 2012 by which JDPW Trust assigned all of its right, title and interest in the security interest in equipment, and personal property owned by CCSEA and formerly held by NewBridge Bank (the "NewBridge Bank Collateral") to Plaintiff NFI in exchange for Plaintiff NFI's loan to JDPW Trust discussed above.  The loan proceeds from NFI were utilized by JDPW Trust to satisfy obligations owed to NewBridge Bank by CCSEA, Dr. Epes, and others for equipment utilized in CCSEA's medical practice.[12]

{18}  NewBridge Bank, formerly known as FNB Southeast, filed a UCC-1 financing statement on October 31, 2007, which served to perfect its security interest in the NewBridge Bank Collateral owned by CCSEA, SEM, and HUTA, and subsequently filed a continuation statement for said financing statement on June 4, 2012 (collectively, the "NewBridge Bank UCC Financing Statements").[13]  NFI contends that by virtue of the NewBridge Bank Assignment, NFI owns the loans

---

[11] A copy of the Amended Financing Statement is attached as Exhibit H to Defendant's Brief in Opposition to Plaintiff's Motion.

[12] A copy of the NewBridge Bank Assignment is attached to Plaintiffs' Complaint as Exhibit P.

[13] Copies of the NewBridge Bank Financing Statements are collectively attached to Plaintiffs' Complaint as Exhibit Q.

which are secured by the NewBridge Bank Collateral identified in the NewBridge Bank UCC Financing Statements.

{19} Pursuant to the terms of the NewBridge Bank Assignment, Plaintiff NFI has alleged it is entitled to immediate enforcement of its security interest in the NewBridge Bank Collateral and has the right to immediate possession of said NewBridge Bank Collateral upon JDPW Trust's default.

{20} Plaintiffs contend that the NewBridge Bank Collateral is in the possession, custody, and control of Defendants.

{21} NFI has made demand upon Defendants for delivery of the NewBridge Bank Collateral. Defendants represented at the February 23, 2015 hearing that they do not contest the validity of NFI's security interest in the NewBridge Bank Collateral and that Defendants will permit NFI to inspect and inventory the NewBridge Bank Collateral upon 24-hours' notice. The parties agree that some part of the NewBridge Bank Collateral is under contract for sale to CEA in the Carolina Eye Transaction with no assurance of payment to Plaintiffs.

{22} On January 9, 2015, in a lawsuit brought by NFI against JDPW Trust and its Trustee, Douglas S. Harris, in Wake County Superior Court, captioned *Nivison Family Investments LLC vs. Douglas S. Harris, Trustee of JDPW Trust U/T/A Dated June 8, 2007 and JDPW Trust U/T/A Dated June 8, 2007* and docketed at 14 CVS 9564, the Wake County Superior Court entered partial summary judgment in favor of NFI against Defendants for possession of the NewBridge Bank Collateral ("Summary Judgment Order").[14] NFI contends that by virtue of the Summary Judgment Order, NFI owns all of the NewBridge Bank Collateral.

{23} NFI has alleged it is entitled to obtain a judgment against Defendants in this proceeding for possession of the NewBridge Bank Collateral and for possession of all of the rights, title, and interest formerly held by NewBridge Bank in the NewBridge Bank Collateral.

---

[14] A copy of the Summary Judgment Order is attached to Plaintiffs' Complaint as Exhibit R.

{24} Another creditor of certain of the Defendants, John T. Harriott, M.D., has filed a lawsuit currently pending in this Court captioned *John T. Harriott, M.D. v. Central Carolina Surgical Eye Associates, P.A., C. Richard Epes, M.D., J. Mark McDaniel, Jr., John D. Matthews, M.D., Bessie K. Epes and Southeastern Cataract Laser Center, PLLC,* and docketed at 14 CVS 9982 in Guilford County Superior Court (the "*Harriott* Litigation"), in which claims of fraudulent transfers in derogation of the interests of the Defendants' creditors have been alleged.[15]

{25} Dr. Harriott moved for a temporary restraining order in the *Harriott* Litigation because on December 31, 2014, CEA entered into an "Asset Purchase Agreement" ("APA") with CCSEA, SCLC, Mr. McDaniel, Dr. Epes, SEM, and HUTA for the purchase of various "Acquired Assets" as defined in the APA. On that same day, CEA entered into an "Agreement for Purchase and Sale of Membership Interest" with EMS Partners, Mr. McDaniel, Ms. McDaniel, Dr. Epes, and Ms. Epes (collectively with the APA, the "Purchase Agreements") for the purchase of EMS Partners' 70% interest in Greensboro Ophthalmology ASC, LLC ("ASC"). The total purchase price under the Purchase Agreements is $990,000 (collectively, the "Carolina Eye Transaction").

{26} After Dr. Harriott filed his motion for temporary restraining order in the *Harriott* Litigation on January 5, 2015, CEA sent a notice of rejection to CCSEA and SCLC rejecting the tangible assets of CCSEA and SCLC and advising that the tangible assets of CCSEA and SCLC were deemed to be "Excluded Assets" within the meaning of Section 2 of the APA and not part of the assets to be acquired by CEA in the Carolina Eye Transaction. Thus, the Purchase Agreements now appear to specifically exclude all assets (both tangible and intangible) of SCLC and CCSEA, and the Carolina Eye Transaction appears to no longer involve the sale or transfer of any assets of either CCSEA or SCLC that could be used to satisfy the claims of any creditor of CCSEA and SCLC.

---

[15] A copy of the Verified Complaint in the *Harriott* Litigation is attached to Plaintiffs' Complaint as Exhibit I.

{27} The Purchase Agreements and related documents reflect that the proceeds of the Carolina Eye Transaction will be disbursed as follows: (i) $44,000 to the Internal Revenue Service, (ii) $96,000 for past due rent to Broadstone SEC North Carolina, LLC, (iii) $110,000 to the Guilford County, NC Tax Collector for past due ad valorem taxes, and (iv) $740,000 to Amsurg Holdings, Inc., to, as reported by the Receiver in the *Harriott* Litigation, "pay off a loan which is secured by some of the same assets [CEA] is acquiring in the [Carolina Eye Transaction]." Counsel for Defendants represented to the Court at the hearing on the motion for temporary restraining order in the *Harriott* Litigation that none of the proceeds of the Carolina Eye Transaction will be disbursed to CCSEA, SCLC, Dr. Epes, Ms. Epes, or Mr. McDaniel or to any entity or person related to or affiliated with any of those persons or entities.

{28} On January 12, 2015, this Court entered an Order in the *Harriott* Litigation in which, *inter alia,* this Court made certain findings of fact and conclusions of law, granted Plaintiffs' motion for expedited discovery, and appointed Gerald A. Jeutter, Jr. ("Mr. Jeutter") as Receiver for the purpose of determining whether the Carolina Eye Transaction is for fair market value and for the benefit of third-party creditors and to make a recommendation to this Court whether preliminary injunctive relief in connection with the Carolina Eye Transaction should be granted.[16]

{29} On February 9, 2015, a hearing was held on Dr. Harriott's motion for preliminary injunction. On February 13, 2015, the Court entered an Order on Preliminary Injunction and Appointment of Receiver in the *Harriott* Litigation by which the Court made certain findings of fact and conclusions of law, enjoined CCSEA, SCLC, Dr. Epes, Ms. Epes, and Mr. McDaniel from disposing of certain assets of CCSEA and SCLC and found that to protect the interests of Dr. Harriott and third-party creditors it is necessary to appoint a Receiver with general authority to take fiscal and operational charge of CCSEA and SCLC for the benefit

---

[16] A copy of the Court's Order is attached to Plaintiffs' Complaint as Exhibit J.

of Dr. Harriott and third-party creditors (the "Order on Plaintiffs' Motion for Preliminary Injunction and Appointment of Receiver"; ¶ 5 (p. 11) (N.C. Super. Ct. Feb. 13, 2015) (partially granting motion for preliminary injunction and appointing receiver)).

{30} As outlined in the Verified Complaint filed in the *Harriott* Litigation, the Defendants are parties to other actions and subject to other claims, judgments, and orders that are similar in nature to the claims at issue in this case. By way of example and not limitation, CCSEA, Dr. Epes, and Mr. McDaniel have been the subject of two separate lawsuits filed by creditors of CCSEA and Dr. Epes in which the plaintiffs in those lawsuits have alleged that these defendants have engaged in unlawful actions intended to defraud and hinder creditors, including the cases of *Priority Healthcare Distribution, Inc. v. Central Carolina Surgical Eye Associates, P.A.; Southeastern Cataract Laser Center, PLLC; M. Mark McDaniel, Jr.; and C. Richard Epes, MD,* filed in the United States District Court for the Middle District of North Carolina, Case No. 13-CV-351,[17] and *Geiger v. Southeastern Cataract Laser Center, PLLC, M. Mark McDaniel, Jr.; and C. Richard Epes, MD,* filed in Guilford County Superior Court, Case No. 14 CVS 3373.[18]

{31} Plaintiffs' Complaint in this action alleges that CCSEA, HUTA Leasing, SEM, SCLC, and EMS Partners operate as mere instrumentalities of Dr. Epes and Mr. McDaniel and have no independent identity separate and apart from Dr. Epes and Mr. McDaniel. Plaintiffs' Complaint further alleges that Dr. Epes and Mr. McDaniel have used these entities to evade lawful creditors of the ophthalmological surgery practice operating at 3312 Battleground Avenue in Greensboro, North Carolina and at other locations throughout the State of North Carolina and to personally enrich themselves through transfers to themselves, their spouses, and to entities owned and controlled by themselves to the detriment of lawful creditors of CCSEA. Plaintiffs' Complaint further alleges that Dr. Epes and Ms. Epes are

---

[17] A copy of the Complaint in this action is attached to the *Harriott* Complaint as Exhibit H.

[18] A copy of the Complaint in this action is attached to the *Harriott* Complaint as Exhibit I.

actively attempting to liquidate certain of their assets, including artwork and their personal home. The Defendants are in the process of finalizing settlement terms with Greer L. Geiger, M.D. and other creditors of the Defendants as outlined in Exhibit BB to Plaintiffs' Complaint, in which Plaintiff NFI has not been permitted to participate.

{32} Based upon the above Findings of Fact, this Court makes the following conclusions of law.

## II.

## CONCLUSIONS OF LAW

{33} A temporary restraining order or a preliminary injunction should "issue[] only (1) if [] plaintiff[s] [are] able to show likelihood of success on the merits of [their] case and (2) [plaintiffs are] likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of [] plaintiff[s'] rights during the course of litigation." *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 401, 302 S.E.2d 754, 759–60 (1983) (citations omitted) (emphasis in original). Moreover, "[a] court of equity must weigh all relevant facts before resorting to the extraordinary remedy of an injunction." *Travenol Labs., Inc. v. Turner,* 30 N.C. App. 686, 694, 228 S.E.2d 478, 484 (1976).

{34} The burden is on the moving party to establish its right to a temporary restraining order, but the remedy "should not be lightly granted." *GoRhinoGo, LLC v. Lewis*, 2011 NCBC 38 ¶ 29 (N.C. Super. Ct. Sept. 29, 2011), http://www.ncbusinesscourt.net/opinions/ 2011_NCBC_38%20.pdf (citations omitted); *Travenol Labs.,* 30 N.C. App. at 692, 228 S.E.2d at 483. A trial court generally "should engage in a balancing process, weighing potential harm to the plaintiff if the injunction is not issued against the potential harm to the defendant if injunctive relief is granted . . . ." *Kaplan v. Prolife Action League of Greensboro*, 111 N.C. App. 1, 16, 431 S.E.2d 828, 835 (1993) (citation and quotation omitted), *overruled on other grounds by Sharpe v. Worland*, 351 N.C. 159, 522 S.E.2d 577 (1999).

{35} The Court concludes that at this stage of the litigation Plaintiffs have not shown a likelihood of success on their claim seeking to enforce their alleged security interest in either the Wyeth Artwork collateral or the Rembrandt Artwork collateral.

{36} As to the Wyeth Artwork, it is undisputed that JP Morgan has a first-priority perfected and secured lien in the Wyeth Artwork, that NFI specifically excepted the Wyeth Artwork in its UCC-1 Financing Statement, and that NFI's General Manager, A. E. Nivison, sent a letter to JP Morgan denying that NFI had a security interest, lien, or other encumbrance in the Wyeth Artwork. Accordingly, the Court concludes that NFI has not shown a likelihood that it will successfully prove it has a valid and enforceable security interest in the Wyeth Artwork.

{37} As to the Rembrandt Artwork, it appears undisputed that Ms. Epes did not sign the Pledge and Guaranty Agreements and that the only witnesses to the execution of these Agreements aver that neither Dr. Epes nor Ms. Epes signed these documents on Ms. Epes's behalf. The Epeses further contend that Dr. Epes was not authorized to sign the documents for Ms. Epes and that the signatures on the documents purportedly on her behalf are forgeries. Although Plaintiffs argue that Defendants' inclusion of Plaintiff as an additional insured on Defendants' insurance coverage for the Rembrandt Artwork is persuasive evidence that Ms. Epes granted Plaintiffs a security interest, the Court cannot conclude on the current record that Plaintiffs have shown a likelihood that they will succeed on their claims as to the Rembrandt Artwork.

{38} The Court further concludes that Plaintiffs have not shown they will suffer irreparable harm if the Carolina Eye Transaction closes. During the hearing on the Motion for Preliminary Injunction in the *Harriott* Litigation, counsel for CEA confirmed that "[CEA] will not close the Carolina Eye [T]ransaction if the proceeds of sale are used in any fashion that will not render the acquired assets free and clear of all liens and encumbrances." Order on Plaintiffs' Motion for Preliminary Injunction and Appointment of Receiver ¶ 12. Further, counsel for CEA represented to the Court at the February 23, 2015 hearing on NFI's Motion for

Preliminary Injunction that CEA would not close the Carolina Eye Transaction without obtaining NFI's agreement to release its security interest in the acquired assets unless the transaction was restructured such that CEA acquired only assets in which Plaintiffs did not have a security interest. Because it appears that Plaintiffs' security interest will not be impaired in the event the Carolina Eye Transaction is consummated, the Court finds NFI has not shown that it will suffer irreparable harm in the absence of its requested relief.

{39} Based on the findings and conclusions above, the Court concludes that Plaintiff NFI is not entitled to a Temporary Restraining Order under applicable law, and therefore Plaintiff NFI's Renewed Motion for Temporary Restraining Order is **DENIED**.

{40} Nevertheless, the Court further finds, for purposes of this Motion, that Plaintiffs have presented substantial evidence that suggests to the Court that certain transfers of funds to Ms. Epes, Ms. McDaniel and others, as well as other conduct by Mr. McDaniel and Dr. Epes in connection with their ongoing operation of CCSEA and SCLC and their related entities, including SEM, HUTA Leasing, and EMS Partners, has been in furtherance of their efforts to defraud, avoid and hinder creditors, including Plaintiffs, and to benefit themselves and their spouses at the expense of creditors of CCSEA, SCLC, and other entities they own or control, including SEM, HUTA Leasing, and EMS Partners.

{41} Based on the evidence of record, it appears to the Court that Dr. Epes and Mr. McDaniel are in the process of winding-up or liquidating their interests in CCSEA, SCLC, SEM, HUTA Leasing, and EMS Partners, and are attempting to liquidate the assets of some or all of these entities. The Court finds it is in the public interest that the Court take swift, appropriate, and carefully tailored action to ensure the equitable distribution of proceeds among creditors of a corporation, professional corporation, limited liability company, or a professional limited liability company in circumstances amounting to a winding-up or dissolution of the entities. Under such circumstances, the officers and directors of a corporation, a professional corporation, a limited liability company or a professional limited liability company

owe a fiduciary duty to the entity's creditors to treat the entity's creditors fairly and equally. *See generally Keener Lumber Co. v. Perry*, 149 N.C. App. 19, 31, 560 S.E.2d 817, 825 (2002).

{42} To determine whether the circumstances amount to a winding-up or dissolution of a corporation or similar entity, our appellate courts have identified the following factors:

a. Whether the corporation was insolvent, or nearly insolvent on a balance sheet basis;

b. Whether the corporation was cash flow insolvent;

c. Whether the corporation was making plans to cease doing business;

d. Whether the corporation was liquidating its assets with a view of going out of business; and

e. Whether the corporation was still prosecuting its business in good faith, with a reasonable prospect and expectation of continuing to do so.

*Id.*

{43} Based on the evidence of record, the Court finds that all of these factors favor the determination that the circumstances here amount to a winding-up or dissolution of CCSEA, SCLC, SEM, HUTA Leasing, and EMS Partners.

{44} Because the circumstances amount to a winding up of the CCSEA, SCLC, SEM, HUTA Leasing, and EMS Partners businesses, Dr. Epes and Mr. McDaniel owe a fiduciary duty to the creditors of CCSEA, SCLC, SEM, HUTA Leasing, and EMS Partners, including Plaintiffs, to treat all creditors fairly and equally. This "duty is breached if the directors take advantage of their position for their own benefit at the expense of other creditors." *Id.* at 30, 560 S.E.2d at 825.

{45} The Court finds that the evidence of record shows that Dr. Epes and Mr. McDaniel have taken steps to breach their fiduciary duty to Plaintiff by paying substantial sums out of CCSEA, SCLC, SEM, HUTA Leasing, and EMS Partners to Ms. Epes, Ms. McDaniel, and other family members and related entities as the

debts of CCSEA, SCLC, SEM, HUTA Leasing, and EMS Partners increased and the economic viability of the businesses waned. If Dr. Epes and Mr. McDaniel are permitted to continue transferring assets from CCSEA, SCLC, SEM, HUTA Leasing, and EMS Partners to their family members and affiliated entities, Plaintiffs would be at risk of significant injury as their claims would go wholly unsatisfied as a result of the improper distributions. The injury caused by the improper liquidation of the assets of CCSEA, SCLC, SEM, HUTA Leasing, and EMS Partners would be irreparable.

{46} Accordingly, unless Defendants are enjoined from further improper liquidation of the assets of CCSEA, SCLC, SEM, HUTA Leasing, and EMS Partners, Plaintiffs will suffer irreparable injury. Plaintiffs will suffer greater injury from a denial of injunctive relief than will be inflicted upon Defendants by the granting of such relief. During the February 23, 2015 hearing on NFI's Motion for Preliminary Injunction, counsel for CCSEA, SCLC, SEM, HUTA Leasing, and EMS Partners (collectively, "Corporate Defendants") indicated that he had preliminary discussions with Mr. Jeutter about serving as receiver for the Corporate Defendants. At the hearing, all parties consented to Mr. Jeutter's appointment as the Receiver for the Corporate Defendants.[19]

{47} **WHEREFORE**, Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction and for Inspection and Inventory of Collateral is **DENIED**.[20]

{48} It is further **ORDERED**, that for good cause shown, Mr. Jeutter is hereby **APPOINTED** as Receiver for the Corporate Defendants. Pursuant to the Court's inherent authority to appoint receivers, *see Lambeth*, 249 N.C. at 321, 106 S.E.2d at 495, and pursuant to N.C. Gen. Stat. §§ 1-501, -502, -507.1, and 39-23.7, Mr. Jeutter

---

[19] "Courts of equity have original power to appoint receivers and to make such orders and decrees with respect to the discharge of their trust as justice and equity may require." *Lambeth v. Lambeth*, 249 N.C. 315, 321, 106 S.E.2d 491, 495 (1959) (citation omitted). The trial court's appointment of a receiver is within its sound discretion. *Barnes v. Kochhar*, 178 N.C. App. 489, 500, 633 S.E.2d 474, 481 (2006) (citation omitted).

[20] The Court denies Plaintiffs' Motion for Inspection and Inventory of Collateral in that, considering the Court's appointment of a Receiver, any effort to inspect and inventory collateral must be authorized by and coordinated with the Receiver.

is hereby vested with the full authority available to a receiver under North Carolina law, including without limitation the powers set forth in N.C. Gen. Stat. § 1-507.2, namely:

 a. To dispose of all or any part of the assets of the Corporate Defendants wherever located, at a public or private sale;

 b. To sue and defend in his own name as Receiver of the Corporate Defendants in all courts of this State; and

 c. To exercise all of the powers of the Corporate Defendants, through or in place of their managers or board of directors, to the extent necessary to manage the affairs of the Corporate Defendants in the best interests of their members, shareholders and creditors.

{49} In furtherance of his duties as Receiver, Mr. Jeutter shall have all the powers and authority usually held by receivers appointed by state courts in North Carolina and reasonably necessary to protect the interests of Plaintiffs and other third-party creditors, including but not limited to the following powers, which may be exercised without further order of the Court:

 a. To take immediate exclusive possession and control of the Corporate Defendants' assets wherever they may be found and to immediately take whatever steps are reasonably necessary to secure, maintain and protect the Corporate Defendants' assets with full power and authority as Receiver to take the same into his possession and to incur expenses as may be necessary or advisable in connection therewith;

 b. To enter into the Corporate Defendants' premises where any of the Corporate Defendants' assets may be, and search for, take possession of, remove, keep, and store any of the Corporate Defendants' assets until the same will be sold or otherwise disposed of;

 c. To operate, manage, maintain, lease, sell, convey, or transfer the Corporate Defendants' assets in whole or in part as may be in the best interests of the receivership estate provided that such sale, conveyance or transfer if any is approved and confirmed by this Court after notice to all parties in interest;

d.     To assume full control and management of the Corporate Defendants and any subsidiary entities;

e.     To exercise all of the powers of the Corporate Defendants, in place of its managers, officers, directors, owners, members, shareholders, and/or partners, to the extent necessary to manage the affairs of the Corporate Defendants in the best interests of Plaintiffs and third-party creditors;

f.     To issue subpoenas as may be deemed necessary by the Receiver;

g.     To control the attorney-client privilege for the Corporate Defendants;

h.     To act immediately to secure and collect the profits, income, revenue, fees, proceeds, and all other funds generated by the Corporate Defendants' assets;

i.     To take immediate possession of all original records, books, bank and other financial accounts, leases, deposits, ledgers, and other materials relating to the operation of the Corporate Defendants' business and the ownership of their assets;

j.     To prepare immediately a list of all of the Corporate Defendants' lien and general creditors and promptly notify the creditors of his appointment as Receiver;

k.     To employ, discharge, and fix the compensation and conditions for such agents, contractors, and employees as are necessary to assist in managing, securing, and liquidating the Corporate Defendants' assets and performing his duties as Receiver;

l.     To enforce any existing contracts and to take such action with respect to such contracts as may be necessary or appropriate to assure the orderly and efficient management of the Corporate Defendants' assets.  However, nothing herein requires the Receiver to assume any leases or contracts of the Corporate Defendants or to perform their obligations arising thereunder, and nothing herein requires the Receiver to pay existing obligations of the Corporate Defendants (except as otherwise provided herein);

m. To negotiate, extend, modify, re-negotiate, ratify, or enter into such contracts or other agreements affecting or relating to any part or all of the Corporate Defendants' assets;

n. To establish and maintain bank accounts in the name of the Receiver for the deposit of monies and funds collected and received in connection with the Receiver's administration of the Corporate Defendants' assets, and to write checks and make withdrawals on such accounts;

o. To execute and prepare all documents and perform all acts in the name of the Corporate Defendants which are necessary or incidental to preserving, protecting, managing, and controlling the Corporate Defendants' assets or which are necessary or incidental to carrying out the powers granted herein and shall institute any and all necessary ancillary proceedings in the State of North Carolina which are necessary to preserve and protect the Corporate Defendants' assets;

p. To keep the Corporate Defendants' assets insured to the extent necessary or appropriate including, but not by way of limitations, fire and extended coverage and general liability insurance;

q. To hire, retain, and otherwise, obtain the advice and assistance of such legal counsel and accounting and other professionals as may be necessary to the proper discharge of the Receiver's duties, with all reasonable expenses incurred in connection therewith deemed to be expenses of the receivership without the permission of the Court (and to pay such professionals from the rents, revenues, and proceeds of the Corporate Defendants' assets without further application to or order of the Court);

r. To defend all actions at law or in equity which may be brought against it or against the Corporate Defendants;

s. To collect receivables and claims arising from the Corporate Defendants' assets;

t. To exercise all of the Corporate Defendants' rights and remedies with respect to proceedings brought to collect any amounts due;

u.    To notify any parties obligated on any of the accounts of the Corporate Defendants to make payment directly to the Receiver of any amounts due or to become due thereunder;

v.    To surrender, release, or exchange all or any part of any accounts of the Corporate Defendants, or compromise or extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder;

w.    To have continuing access to mail or other correspondence to and from the Corporate Defendants concerning the Corporate Defendants' assets;

x.    To perform ordinary and necessary repairs and maintenance on any of the Corporate Defendants' assets;

y.    To account to this Court for all sums received and expenditures made;

z.    With respect to any operation or activity that is now conducted with the Corporate Defendants' assets or is customarily conducted with similar property, and that may lawfully be conducted only under governmental license or permit, to continue such operation or activity under the license or permits issued to the entity subject to compliance with the terms thereof;

aa.    To pay prior obligations incurred by the Corporate Defendants, its agents and employees, or any other person or entity charged with the responsibility of maintaining and operating the Corporate Defendants' assets, if such obligations are deemed by the Receiver to be necessary or advisable for the continued operation of the Corporate Defendants;

bb.    To notify any and all insurers under insurance policies affecting the Corporate Defendants' assets of the pendency of these proceedings and that, subject to the prior rights of any party holding a lien encumbering the Corporate Defendants' assets, any proceeds paid under any insurance policies shall be paid to the Receiver until such time as the said insurance carriers are advised to the contrary by this Court or until they receive evidence of the dismissal of this action;

cc.    To bring all actions at law or in equity, or, as the case may be, such other proceedings as may be necessary and proper to administer and liquidate the Corporate Defendants' assets;

dd. To have all other powers and authority granted to a receiver under N.C. Gen. Stat. §§ 1-501 *et seq.* and/or by further Order of this Court; and

ee. Generally to do such other lawful acts as the Receiver reasonably deems necessary for the effective operation and management of the Corporate Defendants' assets, and to perform such other functions and duties as may from time to time be required and authorized by this Court, by the laws of the State of North Carolina, or by the laws of the United States of America.

{50} The Court further **ORDERS** as follows:

a. No named party shall, directly or indirectly, cause or allow any expenditure or disbursement of any money, proceeds or assets of the Corporate Defendants pending further order of the Court.

b. All financial and business records for the Corporate Defendants shall be gathered, preserved and made available to the Receiver immediately. Any records received at any time in the future are to be immediately delivered to the Receiver.

c. The location of all assets of the Corporate Defendants shall be provided to the Receiver immediately. Any assets of the Corporate Defendants received at any time in the future are to be immediately delivered to the Receiver.

d. No party, directly or indirectly, shall take any action designed to, or negligently causing or allowing the waste, disposal, theft or disposition of any asset of the Corporate Defendants.

e. The Receiver shall be deemed to be, and shall have the duties and powers of, a trustee in an assignment for benefit of creditors in N.C. Gen. Stat. § 23-3 to recover property conveyed fraudulently or in preference and the recording of this Order shall constitute and be deemed the registration of a deed of assignment as provided therein and pursuant to G.S. § 23-1.

f. The Receiver shall file with this Court within forty-five (45) days from the date hereof, or such other time as the Court may order, an itemized and detailed list of all property owned by the Corporate Defendants and identifying so far as it

can determine, all debts and obligations of the Corporate Defendants or encumbrances related to the property in its possession.

g. The Receiver, together with such members and employees of his law firm rendering services in connection with this receivership, shall be entitled to their customary hourly rates, plus expenses, from the revenues held, accrued or accruing from the sale or disposal of the Corporate Defendants' assets following notice and approval of such fees and expenses by this Court.

h. The Receiver shall be paid in accordance with G.S. § 1-507.9, after approval by the Court.

i. The Receiver shall be entitled to pay all premiums for the bond required of the Receiver, premiums on any insurance policies required to protect the Corporate Defendants or their assets, any taxes, and all other expenses and charges incurred in the ordinary course, or by authorization of the Court, which he considers to be reasonable and appropriate in the exercise of his duties during the receivership, to the extent revenues and proceeds from the sale or disposal of the Corporate Defendants' assets are available to do so. The cost of discharging any other obligations or liabilities with respect to the Corporate Defendants, including the Receiver's fees, commissions and attorneys' fees, shall not be paid without the notice and further orders of the court. The aforementioned bond shall be in an amount of $100. This Order, however, shall be immediately effective. The Receiver shall have until 5:00 PM on March 6, 2015 to post the Receiver's bond.

j. The Corporate Defendants and their employees, representatives, agents and all persons acting in concert with the Corporate Defendants, for them and on their behalf, are directed to cooperate with the Receiver to the fullest extent possible and are enjoined from interfering with the Receiver's actions pursuant to this Court's Order. Upon request or when deemed necessary, the parties or their agents shall explain the operation, maintenance and management of the Corporate Defendants and the Corporate Defendants' assets.

k. Nothing herein shall preclude the Receiver, who is a panel trustee for the United States Bankruptcy Court for the Eastern District of North Carolina,

from serving as a Chapter 7 trustee for the Corporate Defendants in the event a subsequent voluntary or involuntary bankruptcy proceeding is filed for or against any of the Corporate Defendants.

l.   Other than Plaintiff's continuance of this lawsuit, all creditors of the Corporate Defendants are hereby enjoined and restrained from in any way interfering with or disturbing the property and assets of the Corporate Defendants, subject to further order of this Court after written motion filed and served on the Receiver and counsel for the parties.

m.  All officers, directors, agents, shareholders, members and employees of the Corporate Defendants and all other persons interested in the Corporate Defendants or their businesses or assets, except as directed or consented to by the Receiver, are enjoined and prohibited from (a) interfering with, transferring, selling, or disposing of any of the property, income or assets of the Corporate Defendants, (b) taking possession of or levying upon or attempting to sell or dispose of in any manner any part of the property of the Corporate Defendants, (c) involving themselves in the possession, operation or management of the Corporate Defendants' business, or (d) interfering in any way with the duties or performance of the Receiver except as expressly permitted by the Receiver.

n.   The Receiver is hereby authorized, empowered and directed to apply to this Court, with notice to the parties, for issuance of such other orders as may be necessary and appropriate in order to carry out the mandate of this Court.

o.   For purposes of this Order, "assets" mean any legal or equitable interest in, right to, or claim to, any real or personal property, tangible or intangible, whether individually or jointly, directly or indirectly controlled, and wherever located, including but not limited to: patents, licenses, intellectual property, chattels, goods, instruments, equipment, fixtures, general intangibles, effects, leaseholds, mail or other deliveries, inventory, checks, notes, accounts (including, but not limited to, bank accounts and accounts at financial institutions), credits, receivables, lines of credit, contracts, insurance policies, and all cash, wherever located.

p.  This Order shall be effective immediately and shall remain in effect for the duration of this litigation or until otherwise ordered by this Court.

**SO ORDERED**, this the 25th day of February 2015.